STEVEN G. KALAR
Federal Public Defender
JOYCE LEAVITT
Assistant Federal Public Defender
1301 Clay Street, Suite 1350N
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email: joyce_leavitt@fd.org

Counsel for Defendant Angelique Marshall

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ANGELIQUE MARSHALL,<br>Defendant. | CR 17 -00310 PJH<br>CR 12-00120 PJH<br><br>DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE<br><br>Date: December 13, 2017<br>Time: 2:30 p.m. |

## TABLE OF CONTENTS

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 3

A. Ms. Marshall's History and Characteristics ........ 3

B. The Nature of the Offense ........ 6

ARGUMENT ........ 7

A. A Non-custodial Sentence with Home Detention with Electronic Monitoring is Appropriate ........ 7

1. The Offense Level overstates the seriousness of the Offense ........ 8

2. Post Offense-Rehabilitation ........ 9

3. The deleterious effects on Ms. Marshall's children were she to be sentenced to prison ........ 10

4. Lack of Guidance and Diminished Capacity ........ 12

B. The Court could alternatively defer sentencing to allow Ms. Marshall to continue Rehabilitation ........ 14

CONCLUSION ........ 14

# TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*California v. Brown*, 479 U.S. 538 (1987) .......... 13

*Gall v. United States*, 552 U.S. 38 (2007) .......... 8, 9

*Pepper v. United States*, 562 U.S. 476 (2011) .......... 9

*United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) .......... 8

*United States v. Blake*, 89 F. Supp. 2d 328 (E.D.N.Y. 2000) .......... 11

*United States v. Cantu*, 12 F.3d 1506 (9th Cir. 1993) .......... 13

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) .......... 8

*United States v. Chambers*, 885 F. Supp. 12 (D.D.C. 1995) .......... 11

*United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) .......... 13

*United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) .......... 11

*United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) .......... 11

*United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993) .......... 13

*United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) .......... 9

*United States v. Trujillo*, 713 F.3d 1003 (9th Cir. 2013) .......... 9

*United States v. Walter*, 256 F.3d 891 (9th Cir. 2001) .......... 13

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) .......... 11

*Williams v. New York*, 337 U.S. 241 (1949) .......... 7

**Federal Statutes**

18 U.S.C. § 2B ........ 8

18 U.S.C. § 1029 ........ 1

18 U.S.C. § 3553 ........ 8, 9, 10

**Other**

USSG § 2B1.1 ........ 8

## INTRODUCTION

Angelique Marshall will be sentenced by this Court on December 13, 2017, after having pled guilty to one count of access device fraud, in violation of 18 U.S.C. § 1029(a)(3) in CR 17-00310 PJH, and admitting to a violations of her supervised release in CR 12-00120 PJH. The probation officer who prepared the Presentence Report filed November 29, 2017 (PSR) calculates the guideline range for that case to be 9 -15 months but recommends a variance to 6 months custody. PSR, Sentencing Recommendation. In addition, the probation officer who prepared the Supervised Release Violation Memorandum dated November 29, 2017 (Memorandum) calculates the advisory guideline range to be 8 – 14 months. Memorandum at p. 2. He recommends a low end consecutive sentence of 8 months custody.

Ms. Marshall understands the reasoning behind the probation officers' recommendations that she serve custodial sentences. From the surface, the conduct in this case appears to be a continuation of past conduct for which she was previously sentenced to custody. At the last revocation on January 8, 2014 for similar conduct, Ms. Marshall was sentenced by the Court to 14 months custody and she now finds herself before the Court again. Ms. Marshall recognizes the seriousness of the situation for which she is solely responsible.

Although Ms. Marshall understands the rationale behind the recommendations, in this case there are significant differences both in the offense conduct and in Ms. Marshall's personal life which cry out for the Court to take a different approach other than custody. Ms. Marshall's offense conduct in this case diverges from past conduct in that although she had the intent to defraud at the time that she obtained the counterfeit cards in July, 2016 because she was desperate and struggling, Ms. Marshall decided not to use them and instead left them at her grandmother's house. In August, 2016, Ms. Marshall was revoked for technical violations and finally referred to counseling, which she had asked for but not yet received, and was also referred to the district's re-entry court program. Ms. Marshall considered the re-entry court, as well as the other learning components, to be life-changing. At the time she was later arrested in November, 2016, she had already begun her rehabilitation and did not have any intent to use the cards and in fact, the government confirmed that the cards were

never used. This is in stark contrast to past cases in which Ms. Marshall actively used counterfeit cards to the full extent possible to support herself while defrauding others. In this case, Ms. Marshall made the initial decision not to use the cards despite her desperation, and her decision to do the right thing was reinforced through her participation in the re-entry court. Unfortunately, once she was arrested in November, Ms. Marshall was no longer able to participate in re-entry court.[1] Ms. Marshall continued to participate in the Courage to Change program for a period of time and has continued her weekly counseling. According to probation officer John D. Woods, Ms. Marshall's therapist at Sharper Future has reported that Ms. Marshall is doing well.[2]

In addition, Ms. Marshall's personal circumstances are significantly different from when she was last before the Court. Ms. Marshall has been working hard to remain law-abiding and provide a safe environment for her children but she continues to struggle with no safety net. Ms. Marshall currently has three children, including sole custody of her 14 year old son, Marcus, who was just returned to her in August, 2017, after years of trying to regain custody of him, and her 3 year old daughter, Anayha. Ms. Marshall does not have anyone who is willing to care for her children for any length of time such that if she is incarcerated as recommended by the probation officers, her children will likely will end up in foster care.

The devastating effects on children of incarcerated parents and for children placed in foster care is well documented. This is especially true where the parent being incarcerated is the mother and primary caretaker. The deleterious effects on Ms. Marshall's children, including the likelihood that they would be exposed to adverse childhood experiences and would be more likely to become involved in the criminal justice system themselves. In this case, Ms. Marshall asks the Court to consider alternatives to incarceration so that she can continue with her own rehabilitation, and protect

---

[1] The re-entry team, including Magistrate Judge Donna Ryu, have determined that Ms. Marshall's cases must be resolved first and the team will then determine whether she would be welcome to rejoin the re-entry court.

[2] Officer Woods relayed this information to undersigned counsel during a recent conversation.

her children from suffering the struggles that she suffered as a child, including physical and sexual assault, homelessness, teenage pregnancy, and involvement in the criminal justice system.

Ms. Marshall asks the Court to vary downward in CR 17 -00310 PJH by two levels, which would account for the fact that the offense level was enhanced by two levels based upon a fictional intended loss value. The resulting guideline range would then be 4-10 months in Zone B of the sentencing table and she asks for a non-custodial sentence. She further asks the Court to impose a non-custodial sentence in response to the violation conduct in CR 12-00120 PJH as well. Alternatively, Ms. Marshall asks the Court to defer sentencing for a year (or however long the Court determines to be sufficient) in order to allow her to continue to demonstrate to the Court that she is committed to her rehabilitation. She files this sentencing memorandum in support of her request. Attached as exhibits are (1) Declaration of Joyce Leavitt in support of sentencing memorandum (Exhibit A); (2) "Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions," by Daniel P. Mears, Joshua C. Cochran, *Journal of Research in Crime and Delinquency*, Nov.14, 2017 (Exhibit B); (3) "Mental and Physical Health of Children in Foster Care," Article by Kristin Turney, Christopher Wildeman, found at http://pediatrics.aappublications.org/content/early/2016/10/14/peds.2016-1118 (Exhibit C); (4) "Family and Residential Instability in the Context of Paternal and Maternal Incarceration," by Melinda Tasca, et. al., *Criminal Justice and Behavior*, Vol. 38 No.3, March 2011 231-247 (Exhibit D); (5) "Prisoners'Assessments of Mental Health Problems Among their Children," by Melinda Tasca, et. al., *International Journal of Offender Therapy and Comparative Criminology* 2014, Vol 58(2) 154-173 (Exhibit E); (6) "Adverse childhood experiences among children placed in and adopted from foster care: Evidence from a nationally representative survey," by Kristen Turney, Christopher Wildemann, Child Abuse & Neglect 64 (2017) 117-129 (Exhibit F).

## STATEMENT OF FACTS

### A. Ms. Marshall's History and Characteristics

Ms. Marshall was born into a family in which drug addiction and physical abuse were woven into the family fabric. Ms. Marshall's father was a violent alcoholic who physically assaulted Ms.

Marshall from the very earliest days of her life whenever he became intoxicated, which was all the time. *See* PSR at ¶55. Her mother was a crack-addict who died when Ms. Marshall was 13 years old. Exhibit A at ¶3. She recalls waking up one day and learning that her mother had died.[3] *Id*.

As a child, Ms. Marshall was beaten frequently by her father, including with a belt. PSR at ¶55. Ms. Marshall explained to the probation officer during the PSR that she suffered physical abuse at the hands of both parents although the worst came from her father. Exhibit A at ¶4. Her mom would "pop" her while the abuse from her father was characterized as more "extreme." She would often come to school with bruises all over her body and he would use a belt buckle or a "switch" to whip her. *Id*. When she was 11 years old, Ms. Marshall's father used a belt buckle and hit her in the face. It was then that she was placed in foster care. *Id*.; PSR at ¶54. Ms. Marshall was in foster care for two years from ages 11 to 13. Exhibit A at ¶¶5-6.

At the first foster care home, Ms. Marshall was thrown down some stairs by the daughter of a foster parent and beaten up. *Id*. at ¶5. Ms. Marshall was then placed at a second her foster home where she was raped by three teenage boys when she was just 12 years old. *Id*.; PSR at ¶56. The boys were friends of her foster sister who were almost adults. *Id*. Ms. Marshall woke up to find one of them holding her down and another covering her mouth. She was raped by all three of them. *Id*. Ms. Marshall was then placed at a third foster home where she was smacked in the face with a comb. *Id*. At that point, she ran away from the last foster care home in July 1999 at the age of 13 years old and started living with a cousin. *Id*. at ¶6. However, the cousin sent her back to her father, who immediately resumed physically assaulting and beating her. *Id*. At that point, Ms. Marshall started living on the streets. *Id*.

At 13 years of age, Ms. Marshall was homeless. She slept in the street, in random cars, or where ever she could find a place to stay. According to Ms. Marshall, she was "raised on the streets." *Id*. She was living on the streets. She wasn't old enough to look for legitimate employment. Ultimately, she had to learn how to hustle in order to survive. *Id*.

---

[3] She is only now coming to terms in therapy with the fact that her mother was gone without warning.

By age 17, Ms. Marshall was pregnant and had given birth to her oldest child, Marcus. PSR at ¶58. His father is serving 30 years for attempted murder. Ms. Marshall tried to provide for her son the only way she knew how, which landed her in custody in the underlying case from 2012. Exhibit A at ¶7. At that time, Marcus was sent to live with an uncle in West Virginia. *Id*. at ¶8. After she was released from prison in 2014, Ms. Marshall tried unsuccessfully to regain custody of Marcus. Marcus was only just returned to Ms. Marshall three months ago in September, 2017 after they had been apart for five years. PSR at ¶58. Ms. Marshall has enrolled him in school and adjusting to being back with his mother.

Ms. Marshall's second child, Andrea Scott is 9 years old and she has joint custody with his Andrea's father, Arthur Scott. *Id*. at ¶59. But there is much turmoil as Mr. Scott has moved and enrolled their daughter in various schools without telling Ms. Marshall their whereabouts. Exhibit A at ¶9. Mr. Scott also has criminal convictions for drugs and corporal injury on a spouse. *Id.* Ms. Marshall has not been able to see this daughter consistently because of issues which are still before the courts relating to noncompliance with the custody arrangement.

Finally, Ms. Marshall has full custody of her 3 year old daughter, Anayha. PSR at ¶7. Anayha's father is around but he is not interested in a relationship with his daughter and does not see her. It was Anayha's father Antone Arajho who initially rented the car for Ms. Marshall which was reported stolen. Exhibit A at ¶10.

Ms. Marshall suffers from mental health issues which stem from her extremely abusive childhood. Mental health records from when Ms. Marshall was in custody in the past indicate that Ms. Marshall was diagnosed with extreme depression and anxiety and prescribed medication. Exhibit A at ¶11. Her symptoms, which included sleeplessness and sleep disturbance and racing thoughts, are also consistent with Post Traumatic Stress Disorder (PTSD). PTSD needs to be treated or it remains indefinitely. Ms. Marshall has been attending counseling since August, 2016 and, according to her therapist at Sharper Future, she is doing well.

Ms. Marshall was employed doing in-home care over the past year. She had emergency surgery in August, 2017 to repair an intestinal blockage and was hospitalized for two weeks. PSR at ¶67. She has not been given any additional in-home care clients since she was hospitalized. Ms. Marshall is in

the process of placing her youngest daughter in pre-school and she will then have more flexibility to remain employed.

All of Ms. Marshall's children are healthy. However, Ms. Marshall has no relatives who are willing to care for them should she go into custody. They would be likely to fall to the foster system. Ms. Marshall's life demonstrates how foster care can further destroy the most vulnerable individuals and lead to homelessness and/or involvement in the criminal justice system. Ms. Marshall was physically abused and raped while in foster care. She ultimately became homeless because it was a safer alternative than returning to the abuse suffered either in foster care or at home. She ultimately turned to crime to support herself because at 13 years of age, there were no other options. Ms. Marshall is trying to protect her children from falling victim to the same system which negatively influenced her life and she is finally on the right path. This should be encouraged.

**B.  The Nature of the Offense**

Ms. Marshall has pled guilty to one count of access devise fraud on July 12, 2017. PSR at ¶2. She was stopped on November 19, 2016 in what was reported to be a stolen car. *Id*. at ¶6. During an inventory of the car, 18 blank debit cards were found in an oversized bag belonging to Ms. Marshall was using as a purse. PSR at ¶5-11. At the time of her arrest, Ms. Marshall explained to officers that the car was not stolen but was a rental car which her youngest daughter's father, Antone had rented from Easy Rent a Car and she had been paying the weekly rental fee. PSR at ¶8. When Ms. Marshall could no longer afford the rental payments, she asked Antone to pay and she would pay him back. *Id*. He had agreed but then didn't follow through and the car was reported stolen without her knowledge. *Id*. The San Leandro Police Department called the rental car company and spoke to a representative who confirmed that the car had been rented but reported stolen after the company did not receive a payment. *Id*. at ¶7. In addition, through defense investigation, records from the rental company were obtained and the name on the rental forms for the car in which Ms. Marshall was arrested was Antone Arajho. Exhibit A at ¶10. This is consistent with what Ms. Marshall told the San Leandro police. PSR at ¶7-9.

Furthermore, the fraudulent access device cards which were found in a bag belonging to Ms. Marshall inside the rental car during the November 19, 2016, traffic stop were obtained in July, 2016,

and it was at the time that she acquired the cards that Ms. Marshall had the intent to defraud. *See* Plea Agreement at ¶2; PSR at ¶11. Ms. Marshall was unemployed and desperate when she obtained the cards but ultimately decided not to use them. PSR at ¶11. She left them at her grandmother's house, where her abusive alcoholic father, and a number of other relatives, still reside in July, 2016. *Id.*

In August, 2016, she was referred to re-entry court and, according to Ms. Marshall, it opened her eyes. She started looking at things differently and through her relationship with probation officer Mike McFarland who ran the employment class, was motivated to come up with strategies to work around her dyslexia and learning disabilities and set employment goals. She was also participating in the other programming components of the re-entry court.

In November, 2016, Ms. Marshall's aunt was cleaning the grandmother's house and came across the documents. PSR at ¶11. Her aunt gave the documents to Ms. Marshall and told her to get rid of them. *Id*. Ms. Marshall had the cards in her bag when she was stopped by the police in November, 2016. *Id*. Ms. Marshall was planning to dispose of the cards but hadn't done it yet. However, she had no intention of using the cards at the time of her arrest.

In order to corroborate Ms. Marshall's statements, regarding her possession of the counterfeit cards, undersigned counsel spoke with Ms. Marshall's aunt, Harriet Marshall on March 1, 2017. Exhibit A at ¶12. Harriet confirmed that she had found the debit cards along with some of Ms. Marshall's belongings at her mother's house in November, 2016. *Id*. Harriet was cleaning the house in November, 2016, because the house was being inspected on November 21, 2016. She doesn't remember the exact date that she found the cards but states it was the week beforehand. She gave Ms. Marshall the counterfeit cards at that point and told her to get rid of them. *Id*. She gave Ms. Marshall the cards prior to the November 21, 2016 inspection. *Id*. Ms. Marshall was the pulled over by police on November 19, 2016 and the cards were still in her bag at that time. She is embarrassed by her conduct and extremely remorseful.

## ARGUMENT

### A. A Non-custodial Sentence with Home Detention with Electronic Monitoring is Appropriate

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted

person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The sentence recommended in the Sentencing Guidelines is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).

Ms. Marshall recognizes that a non-custodial sentence, in light of the advisory guidelines, represents a variance. She asks the Court to use its discretion as the sentence requested furthers many of the § 3553(a) sentencing goals. A number of the factors are discussed below.

**1. The Offense Level overstates the seriousness of the Offense**

The notes to Sentencing Guideline § 2B1.1 specifically provide that "there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." USSG § 2B1.1., comment. (n.20). The guideline commentary provides further that:

> The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

USSG § 2B1.1., comment. (backg'd.)

In the present case, Ms. Marshall's guideline offense level is increased by 2 levels to account for a loss of $9000 despite the fact that the cards were never used and there was neither any actual loss nor even any intended loss. *See* PSR at ¶20 relying upon USSG § 2B1.1(b)(1)(B). The application note to this section provides that for any case involving a counterfeit access device, the loss "shall be not less than $500 per access device." USSG § 2B1.1(b)(1)(B), comment. (n.3). Were the offense level to reflect the fact that there was no actual or intended loss, the resulting range would be 4 -10 months

rather than 9-15 months. In keeping with the Commission's determination that the loss serves as a measure of the seriousness of the offense and relative culpability, the Court should consider a variance in the sentence to account for the fact that the offense level overstates the seriousness of the offense conduct. Ms. Marshall determined that she would not use the fraudulent cards and she did not intend for there to be any loss. This is a legitimate factor for the Court to consider.

**2. Post Offense-Rehabilitation**

This Court can consider "post-crime maturation and self-rehabilitation" at sentencing. *See United States v. Ruff,* 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that post-sentencing or post-offense rehabilitation—particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct—[is] a critical factor to consider in the imposition of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011) and *Gall*, 552 U.S. at 59 (emphasis added)). Such rehabilitation is "the most up-to-date picture" of a defendant's history and characteristics, which in turn sheds light on whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492 (quoting 18 U.S.C. § 3553(a)(1))

The offense conduct in this case occurred on July 5, 2016, which is when Ms. Marshall obtained the counterfeit debit cards with the intent to defraud. Plea Agreement at ¶2. By the time she was arrested four months later in November, 2016, Ms. Marshall had no criminal intent. She had already started re-entry court which she states changed her thinking completely. Exhibit A at ¶13. She has set goals for employment and education. *Id*. She loved attending the meetings and appreciated the support. *Id*. She also appreciated the counseling which she still attends.

Once Ms. Marshall was terminated from the re-entry court program after being charged with the cards in her possession on November 19, 2016, she struggled without the intensive support that reentry court provided. It has been difficult for her to make all of her appointments because of real child care issues.[4] And her depression and anxiety over her future and that of her

[4] Ms. Marshall is not allowed to bring her children to programming and her 14 year old is not allowed to sit in the waiting room during counseling. This is not the same as with male participants who often have child care taken care of. Ms. Marshall does not have a safety net but is doing what she can.

children have also made it hard for her. But Ms. Marshall has not committed any crimes since obtaining the debit cards in July, 2016 (which she never used) and she intends to continue living a law-abiding life and create a stable environment for her children. She is the first to admit that she needs help. Exhibit A at ¶13. In light of her post-offense rehabilitation, sentencing Ms. Marshall to prison at this point would be "greater than necessary" and would directly contravene 18 U.S.C. § 3553(a).

Ms. Marshall understands that the probation officers' recommendations is incremental punishment in light of the last sentence she received in 2013. This Court also has expressed support for a model which involves incremental punishment. But recent studies have found that incremental punishment is not always the most effective way to reduce recidivism and that sometimes less severe punishment appears to be more effective. Exhibit B at p.1. Recent research tested this hypothesis to determine whether, in fact, among "second-time felons," progressively tougher sanctions more effectively reduced recidivism than did progressions to comparable or less severe sanctions. It found that for two thirds of the sanction progressions, tougher sanctions appeared to be criminogenic. *Id* at p. 33. For example, among individuals whose first felony led to imprisonment, recidivism was lower when, in response to a second felony, they were sentenced to less severe sanctions. *Id*. Regular and intensive probation typically were associated with lower rates of recidivism. *Id*. It is true that this is not Ms. Marshall's second felony and it is also true that she has been sent to prison more than once. But the fact remains that a more severe punishment than what was imposed previously is not necessarily justified as a means to reduce recidivism or ensure deterrence. The intensive supervision that came with re-entry court was successful. Ms. Marshall's post offense rehabilitation warrants a reduced sentence and imposition of a non-custodial sentence.

**3. The deleterious effects on Ms. Marshall's children were she to be sentenced to prison**

Ms. Marshall is a struggling single mother who has sole custody of two children, ages 14 and 3, and joint custody of another child. Both before and after *Booker*, whether characterized as a guidelines departure or § 3553(a) variance, courts have long recognized that a defendant's family pays a high price when the court imposes a prison sentence. For example, even before *Booker*, Judge

Sporkin observed, in a case involving a single mother with two children where incarcerating the defendant would deprive the children of their sole parent, "that children need supportive and loving parents to avoid the perils of life is without question . . . causing needless suffering of young, innocent children does not promote the ends of justice." *United States v. Chambers*, 885 F.Supp. 12, 15 (D.D.C. 1995). After *Booker*, courts have been mindful of the collateral consequences of separating a parent from his or her children and not hesitated to impose non-guidelines sentences based on family circumstances. *E.g., United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (where guideline range was 41 to 51 months, imposition of probation affirmed in part due to close relationship of father and child); *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) (variance where guidelines range was 37 to 46 months, imposition of home confinement affirmed because defendant's family would "benefit more by [defendant's] presence than society is going to benefit from her incarceration" ); *United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008)(where guidelines 37-46 months, court granted downward variance to probation with six months halfway house because of devastating effect mother's imprisonment would have on defendant's 8 year old son.) t*United States v. Blake*, 89 F. Supp. 2d 328 (E.D.N.Y. 2000) (departure from level 29 to level 8 and probation proper in part because of emotional trauma 3 year old daughter would suffer).

Furthermore, study after study has demonstrated that "parental incarceration has been linked to a host of psychological and social difficulties [for their minor children], including substance abuse, problems in school, aggression, gang membership and delinquency." Exhibit D at p. 231; *See also* Exhibit E at p. 165 ("children of incarcerated parents are a vulnerable population."). These studies further find that effect of maternal incarceration exacerbates the difficulties that arise were either parent to be imprisoned. *See, e.g*. Exhibit D at p.241 (residential instability significantly influences rearrest in minors and youth with an incarcerated mother were 2.414 times more likely to be rearrested than youth whose mothers were not incarcerated. This particular study explains the phenomenon stating that "the significant effect of maternal incarceration on youth rearrest may be explained by the critical and instrumental role mothers play in their children's lives." *Id*. This particular study further states:

> Our findings suggest that poor single mothers struggle with a host of factors in addition to the care and supervision of their children. And it is the broken tie to the mother upon her incarceration and the residential instability that often follows that we suspect increase the likelihood that the youth will be rearrested.

Exhibit D at p. 244-46 ("Our research informs social policy, as it clearly demonstrates the deleterious effects of maternal incarceration on their children.")

Of course, for those children who end up in foster care, the outcome for them is far worse. *See, e.g.* Exhibit C at p. 2 ("Children . . . placed in foster care, compared with their counterparts. . . disproportionately struggle in school, have trouble finding employment, and abuse drugs and alcohol in adolescence and early adulthood." ); Exhibit F at p. 117 ("Children in foster care, an already vulnerable population, are disproportionately exposed to adverse childhood experiences (ACEs). This exposure, given the link between ACEs and health, may have implications for the children's health and wellbeing throughout the life course.")

In this case, Ms. Marshall is a single parent to two children who will have no place to go, should she be incarcerated. At best, the children would be moved around with no stable home and no stable caregiver. More likely, they will end up in foster care. Ms. Marshall is a prime example of what can happen to a vulnerable child in foster care and the horrors which she experienced is consistent with the literature. Ms. Marshall was removed from her home and sent to foster care because her father was beating and physically assaulting her on a regular basis. However, at the foster homes, Ms. Marshall was still assaulted or beaten at two of three placements and she was gang-raped at the third place. She also ended up homeless by age 13. So Ms. Marshall knows full well what is likely to happen to her children if they end up in foster care. She is desperate for that not to happen. Ms. Marshall is a caring mother who has worked hard to address the scars she carries with her. She urges the Court not to subject her children to the same possible fate. This Court should consider the extreme harm that could come to Ms. Marshall's children in deciding whether a sentence of imprisonment for her is appropriate and necessary in order to achieve the goals of sentencing.

**4. Lack of Guidance and Diminished Capacity**

Evidence about the defendant's background and character is relevant because of the belief, long

held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987)(O'Connor, concurring). Furthermore, the Ninth Circuit has determined that extraordinary childhood abuse and lack of guidance as a youth may be mitigating factors which render a defendant less culpable. *United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991); *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001).

In this case it is irrefutable that Ms. Marshall lacked guidance as a youth and was subjected to extraordinary childhood abuse as described above. Furthermore, Ms. Marshall's diminished capacity is an additional mitigating factor and the guidelines recognize that a below sentence may be warranted where someone commits an offense while suffering from significantly reduced mental capacity which contributed to the commission of the crime. *See, e.g. United States v. Cantu*, 12 F.3d 1506, 1512, 1516 (9th Cir. 1993)(The goal . . .is lenity towards defendants whose ability to make reason decisions is impaired); *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993)(granting a four level departure where defendant's depression contributed to commission of the offense finding that even though drug use and even though mental disease not severe, drug use was both "a product and factor of his impaired condition.").

In this case, Ms. Marshall was severely depressed and likely suffered from PTSD. Her mental health conditions caused by her traumatic past undoubtedly contributed to the offense conduct. As a recent article explains:

> [I]n a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions.

Burch, Audra, *A Gun to His Head as a Child. In Prison as an Adult.*, NEW YORK TIMES (October 15, 2017). It is often repeated by courts that childhood trauma is not an excuse for an adult's behavior. This Court has, on occasion, dismissed years of neglect and abuse inflicted upon a helpless child, arguing that a grown person had plenty of time to decide what type of adult he should be. However, childhood trauma does not have an expiration date. Indeed, trauma is a major factor "that shapes . . . criminal behavior in adulthood." *Id*. It is a "huge factor within the criminal justice system." *Id*. Ms.

Marshall's childhood trauma undoubtedly has shaped her adulthood and continues to impact her every day of her life.

Notwithstanding her incredibly difficult childhood, Ms. Marshall has the fortitude and strong desire to lead a law-abiding and productive life. Ms. Marshall is working hard to try and ensure that her children's story do not have the same trajectory that hers has had. The Court should allow Ms. Marshall to continue her rehabilitation and impose a non-custodial sentence which includes intensive supervision and training.

**B. The Court could alternatively defer sentencing to allow Ms. Marshall to continue rehabilitation**

Should the Court determine that it would benefit from seeing how Ms. Marshall continues to perform on supervision in determining an appropriate sentence, Ms. Marshall asks the Court to defer sentencing for whatever period it deems appropriate. Ms. Marshall would like to continue with some of the programming which was terminated, including participation in re-entry court, and to continue with her treatment. For these reasons, the Court may wish to defer sentencing for a period of time to ensure that Ms. Marshall continues her rehabilitation.

## CONCLUSION

For the reasons set out above, Ms. Marshall asks the Court to sentence her to a non-custodial sentence so that she can continue with her rehabilitation and create a stable and safe environment for her children. Alternatively, she asks the Court to defer sentencing to allow her to demonstrate to the Court her ongoing commitment to living a law-abiding healthy life for herself and her children.

DATED: December 8, 2017

STEVEN G. KALAR
Federal Public Defender

/S/

JOYCE LEAVITT
Assistant Federal Public Defender